UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2020 AUG 19  PM 2: 49

CLERK

BY_____
DEPUTY CLERK

LORI R.,                              )
          Plaintiff,                  )
                                      )
     v.                               )          Case No. 2:18-cv-00153
                                      )
COMMISSIONER OF SOCIAL SECURITY,      )
                                      )
          Defendant.                  )

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR AN ORDER
REVERSING THE DECISION OF THE COMMISSIONER AND DENYING THE
COMMISSIONER'S MOTION TO AFFIRM**
(Docs. 7 & 10)

Plaintiff Lori Rathbone is a claimant for Social Security Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") payments under the Social

Security Act ("SSA") and brings this action pursuant to 42 U.S.C. § 405(g) to reverse the

decision of the Social Security Commissioner (the "Commissioner") that she is not

disabled.[1] (Doc. 7.) The Commissioner moves to affirm. (Doc. 10.) The court took the

pending motions under advisement on May 23, 2019.

After her applications for DIB and SSI were denied initially and on

reconsideration by the Social Security Administration, Administrative Law Judge

("ALJ") Lisa Groeneveld-Meijer found Plaintiff was ineligible for benefits based on her

conclusion that Plaintiff can perform jobs that exist in significant numbers in the national

economy and was therefore not disabled between the alleged onset date of May 29, 2014

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a continuous period of not less than
[twelve] months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or
mental impairment or impairments" must be "of such severity" that the claimant is not only
unable to do any previous work but cannot, considering the claimant's age, education, and work
experience, engage in any other kind of substantial gainful work which exists in the national
economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

through June 21, 2017, the date of her decision.

Plaintiff identifies two errors in the disability determination. First, Plaintiff asserts the ALJ erred at Step Two in not evaluating Plaintiff's Attention Deficit Hyperactivity Disorder ("ADHD") and finding her degenerative disc disease of the lumbar spine and hearing loss were not severe impairments. Second, Plaintiff contends the ALJ erred in the weight assigned to both treating and non-examining medical opinions.

Plaintiff is represented by Phyllis E. Rubenstein, Esq. The Commissioner is represented by Special Assistant United States Attorney Oona M. Peterson.

## I.    Procedural History.

Plaintiff filed her application for DIB and SSI on July 31, 2015, alleging a disability onset date of December 1, 2012, which was later amended to May 29, 2014. Her claims were denied initially on October 9, 2015 and upon reconsideration on December 9, 2015. Plaintiff timely filed a written request for a hearing, which was held before ALJ Groeneveld-Meijer on May 23, 2017. Plaintiff appeared in person and was represented by counsel. Both Plaintiff and Vocational Expert ("VE") John F. Bopp testified.

On June 21, 2017, the ALJ issued an unfavorable decision. Plaintiff timely filed an appeal before the Appeals Council on July 6, 2017, which denied review on July 16, 2018. The ALJ's determination therefore stands as the Commissioner's final decision.

## II.    ALJ Groeneveld-Meijer's June 21, 2017 Decision.

In order to receive DIB or SSI under the SSA, a claimant must be disabled on or before the claimant's date last insured. A five-step, sequential-evaluation framework determines whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe impairment or combination of
> impairments; (3) whether the impairment meets or equals the severity of the
> specified impairments in the Listing of Impairments; (4) based on a
> "residual functional capacity" assessment, whether the claimant can
> perform any of his or her past relevant work despite the impairment; and
> (5) whether there are significant numbers of jobs in the national economy
> that the claimant can perform given the claimant's residual functional

capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R.

§§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). "The claimant has the general burden of

proving that he or she has a disability within the meaning of the Act, and bears the burden

of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step

framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128

(2d Cir. 2008) (internal quotation marks and citation omitted). At Step Five, "the burden

shift[s] to the Commissioner to show there is other work that [the claimant] can perform."

*McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

ALJ Groeneveld-Meijer determined Plaintiff met the insured status requirements

under the SSA through December 31, 2019. At Step One, the ALJ found Plaintiff had not

engaged in substantial gainful activity since May 29, 2014. At Step Two, she concluded

Plaintiff suffered from the following severe impairments: "status post myocardial

infarction" with stenting, hypertension, Post Traumatic Stress Disorder ("PTSD"),

anxiety, and depression. (AR 17.) Although the ALJ determined that Plaintiff's sacroiliac

("SI") joint inflammation, back pain, and hearing loss were not severe impairments, these

limitations were "considered and included upon assessing [Plaintiff's] residual functional

capacity" ("RFC"). *Id.* at 18.

At Step Three, ALJ Groeneveld-Meijer found Plaintiff did not have an impairment

or combination of impairments that met or medically equaled the severity of one of the

Listings. She concluded that the severity of Plaintiff's heart condition and its associated

symptoms did not meet the Listings for cardiovascular system impairments because there

was no evidence of chronic and recurring heart failure under Listing 4.02; repeated stress

tests were negative with no abnormalities; Plaintiff had not suffered three episodes of

ischemia requiring revascularization within a twelve-month period; Plaintiff's medical

records contained no angiographic evidence of certain specific criteria under Listing

4.04(c); and there was no evidence that Plaintiff suffered recurrent arrhythmias not

related to reversible causes under Listing 4.05.

ALJ Groeneveld-Meijer also considered Plaintiff's hypertension and found it did

not meet the criteria for severity under Listing 4.00 because "[h]er records show her hypertension is generally controlled with medication, and there is no evidence reflecting that it results in functional limitations to other body systems." *Id.* at 19. The ALJ further determined that Plaintiff had only mild limitations in understanding, remembering, or applying information and moderate limitations in interacting with others; concentration, persistence, and pace; and adapting and managing herself.

At Step Four, ALJ Groeneveld-Meijer determined Plaintiff had the RFC to:

[P]erform light work as defined in 20 CFR [§§] 404.1567(b) and 416.967(b). She is unable to climb ladders, ropes[,] and scaffolds. She must avoid concentrated exposure to no more than moderate noise levels and to potential hazards, such as unprotected heights and moving machinery. She must avoid concentrated exposure to fumes, odors, dusts, gases, poorly ventilated areas, extreme hot and cold temperatures[,] and humidity. She is able to perform routine work, but no fast[-]paced[]work (defined as no belt paced work or timed work). She is unable to perform work where interaction with the general public is part of the job duties, but she is able to have incidental contact with the general public.

*Id.* at 21. The ALJ concluded that Plaintiff was unable to perform any past relevant work as a deli cutter/slicer, home attendant, cashier/checker, taxicab starter, appointment clerk, and accounting clerk because these jobs exceeded her RFC.

At Step Five, ALJ Groeneveld-Meijer noted Plaintiff was forty-six years old, which is defined as a "younger" individual between the age of eighteen and forty-nine under the regulations, and that Plaintiff had a high school education. *Id.* at 28. Considering Plaintiff's age, education, work experience, and RFC, the ALJ found Plaintiff could perform jobs that exist in significant numbers in the national economy, including "price marker[,]" "housekeeping cleaner[,]" and "routing clerk[.]" *Id.* at 29 (citations omitted). As a result, the ALJ concluded Plaintiff was not disabled from May 29, 2014 through the June 21, 2017, the date of her decision.

## III.  Conclusions of Law and Analysis.

### A.  Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the

4

record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (citation and internal quotation marks omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks omitted).

It is the Commissioner who resolves evidentiary conflicts and determines credibility issues, and the court "should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *see also Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (noting "genuine conflicts in the medical evidence are for the Secretary to resolve"). Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").

### B. Whether the ALJ Erred at Step Two in Finding Plaintiff's Degenerative Disc Disease of the Lumbar Spine and Hearing Loss Were Not Severe Impairments and in Not Evaluating Her ADHD.

Plaintiff argues that ALJ Groeneveld-Meijer committed legal error at Step Two by determining Plaintiff's degenerative disc disease of the lumbar spine and hearing loss were not severe impairments and by failing to evaluate her ADHD, which Plaintiff did not allege as a basis for her disability.

The Second Circuit has repeatedly held that "the standard for a finding of severity under Step Two of the sequential analysis is *de minimis* and is intended only to screen out the very weakest cases." *McIntyre*, 758 F.3d at 151; *see also Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (agreeing with the Supreme Court and sister circuits that "Step Two may do no more than screen out *de minimis* claims") (citing *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987) (O'Connor, J., concurring)). An impairment or combination of

impairments is "severe" at Step Two if it "significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). In contrast, an impairment is "not severe" if the medical evidence clearly establishes it has no more "than a minimal effect on an individual's physical or mental ability(ies) to do basic work activities[.]" SSR 85-28, 1985 WL 56856, at *3 (Jan. 1, 1985); *accord* SSR 96-3p, 1996 WL 374181, at *1-2 (July 2, 1996); *see also James C. v. Comm'r of Soc. Sec.*, 2020 WL 103813, at *4 (D. Vt. Jan. 9, 2020) ("An impairment is 'not severe' when medical evidence establishes 'only a slight abnormality . . .[,] which would have no more than a minimal effect on [the claimant's] ability to work.'") (alterations in original) (quoting SSR 85-28, 1985 WL 56856, at *3). Whether an impairment is "severe" also has a durational component: "Unless [a claimant's] impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least [twelve] months." 20 C.F.R. § 404.1509.

At Step Two, ALJ Groeneveld-Meijer acknowledged that Plaintiff alleged disability due to sacroiliac joint inflammation and back pain but found "there are no significant objective medical findings in the record to support a finding of a severe impairment[] within the meaning of the Regulations." (AR 18.) Although Plaintiff had recently injured her coccyx and was assessed as having SI joint inflammation, diagnostic imaging in February of 2017 showed only mild bilateral SI joint sclerosis and mild degenerative disc changes in the lumbar spine. The ALJ noted Plaintiff's medical records "show mostly sacral and coccyx discomfort" and that Plaintiff reported in March of 2017 that she was training to run a 5k race. *Id.*[2] Plaintiff further testified at the ALJ hearing that her lower back and hip pain had begun recently and that she had her first physical therapy appointment to treat the pain the day before the hearing. She stated that she did yoga and took over-the-counter pain medications as well as gabapentin to treat her hip pain.

---

[2] Plaintiff cites records indicating that she intended to walk in this race but does not contest the ALJ's finding that in October of 2015, Plaintiff reported during a cardiac stress test that she was training for a 5k and had "jogged [two] nights ago, felt well." (AR 1336.)

6

The ALJ concluded "[t]here have not been at least [twelve] months of symptoms resulting in significant functional limitations" and thus Plaintiff's back pain "is not considered severe under the Regulations." *Id.* She further stated "this impairment and the resulting limitations [were] considered and included upon assessing [Plaintiff's] [RFC][.]" *Id.* Plaintiff's RFC includes a number of exertional limitations such as a restriction to light work, climbing limitations, avoidance of exposure to unprotected heights and moving machinery, and no belt paced or timed work. Plaintiff fails to explain why these limitations are insufficient to accommodate her mild lower back and hip pain.

ALJ Groeneveld-Meijer also considered whether Plaintiff's hearing loss following a right eardrum burst was severe, noting that Plaintiff was assessed for a right tympanic membrane perforation in September of 2016. Observing that Plaintiff's "[m]edical records do not reflect significant and persistent functional limitations resulting from right ear impairment[,]" the ALJ found that "in light of [Plaintiff's] difficulty in hearing in an environment with [background] noise, this limitation is included in the [RFC] assessment noted below." *Id.* Again, Plaintiff fails to demonstrate factual or legal error in this conclusion.

It is well established that remand is not warranted where the ALJ "identifies some severe impairments at Step [Two], and then proceeds through [the] sequential evaluation on the basis of [the] combined effects of all impairments, including those erroneously found to be non severe[.]" *Smith v. Comm'r of Soc. Sec.*, 351 F. Supp. 3d 270, 278 (W.D.N.Y. 2018) (second and third alterations in original) (quoting *Guerra v. Comm'r of Soc. Sec.*, 2018 WL 3751292, at *3 (W.D.N.Y. Aug. 7, 2018)). Although the ALJ found Plaintiff's sacroiliac joint inflammation, back pain, and hearing loss were not severe, she considered them in the remaining steps of the sequential disability analysis and incorporated them into Plaintiff's RFC. Any error in finding these impairments were not severe was therefore harmless. *See Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (holding ALJ's error in finding certain conditions were not severe at Step Two was harmless because impairments were "specifically considered" in "subsequent steps") (summary order); *Howard v. Comm'r of Soc. Sec.*, 203 F. Supp. 3d 282, 297 (W.D.N.Y.

2016) ("Courts have held that error at [S]tep [T]wo in determining the severity of impairments is harmless if the ALJ finds at least one other severe impairment and continues through the sequence of the disability analysis because the non-severe impairments can later be considered at the RFC stage.") (collecting cases).

Plaintiff asserts that the ALJ's lack of evaluation of her ADHD entitles her to remand. Because the claimant bears the burden of showing that she has a severe impairment at Step Two, the failure to consider an omitted impairment "does not necessitate remand where the record is devoid of evidence that the allegedly omitted impairment[] [was] severe." *Smith*, 351 F. Supp. 3d at 278 (quoting *Guerra*, 2018 WL 3751292, at *2). Although several examining physicians have diagnosed Plaintiff with ADHD,[3] "mere diagnosis . . . without a finding as to the severity of symptoms and limitations does not mandate a finding of disability[.]" *Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008) (summary order). Plaintiff did not list ADHD as a severe impairment when applying for DIB and SSI. *See* AR 524 (listing heart attacks, stents, high blood pressure, PTSD, and anxiety). During the period of alleged disability, she took Adderall as prescribed and reported to treating provider James Greenleaf, APRN ("APRN Greenleaf") in July of 2016 that this regimen was "helpful[.]" *Id.* at 1619.[4] Rima B. Carlson, M.D., Plaintiff's treating primary care physician, noted on November 6, 2017 that Plaintiff's ADHD was "[s]table[.]" *Id.* at 92. Against this backdrop, any failure to evaluate Plaintiff's ADHD was harmless. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) ("[W]here application of the correct legal principles to the record could lead [only to the same] conclusion, there is no need to require agency reconsideration.") (alterations in original) (quoting *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

---

[3] *See, e.g.*, AR 687 (treatment note from Rima B. Carlson, M.D. dated February 23, 2012, stating Plaintiff had attention deficit problems, "was recently restarted on Adderall last month[,]" and that "she can concentrate better, since her 'mind is not going so fast'"); *id.* at 1231 (noting in Gregory Korgeski, Ph.D.'s August 25, 2015 consultative exam that Plaintiff had "[a]ttention deficit disorder by self-report and medical history").

[4] *See also* AR 1674 (noting same on September 22, 2016); *id.* at 1702 (noting same on October 26, 2016); *id.* at 1731 (noting same on January 23, 2017); *id.* at 1789 (noting same on March 31, 2017).

8

## C.    Whether the ALJ Properly Weighed the Medical Opinion Evidence.

Plaintiff contends that ALJ Groeneveld-Meijer erred in assigning only limited weight to the opinions of her treating provider, APRN Greenleaf, and her treating psychologist, Amy Handy, M.A.; in giving partial weight to the opinion of examining consultant Gregory Korgeski, Ph.D.; and in giving significant weight to the opinions of non-examining state agency consultants Geoffrey Knisely, M.D., Joseph Patalano, Ph.D., and Edward Hurley, Ph.D.

When making a determination of disability, an ALJ must consider "all of the available evidence in the individual's case record[,]" including the opinions of medical sources. SSR 06-03p, 2006 WL 2329939, at *1 (Aug. 9, 2006).[5] The ALJ will consider the following factors for "every medical opinion [he or she] receive[s]": (1) whether the source examined the claimant; (2) whether the source is a treating source, and, if so, the length of the treatment relationship and frequency of examination, and the nature and extent of the treatment relationship; (3) whether the opinion is supported by relevant evidence, "particularly medical signs and laboratory findings"; (4) the consistency of the opinion "with the record as a whole"; (5) whether the opinion is authored by "a specialist" and is "about medical issues related to his or her area of specialty"; and (6) other factors "which tend to support or contradict the medical opinion." 20 C.F.R. §§ 404.1527(c), 416.927(c); *accord* SSR 06-03p, 2006 WL 2329939, at *4-5.

Plaintiff argues that the opinions of APRN Greenleaf and Ms. Handy are entitled to controlling weight as treating sources. However, because Plaintiff filed her DIB and SSI applications prior to March 27, 2017, APRN Greenleaf was not an acceptable medical source under the applicable SSA regulations, and thus he was not a "treating

---

[5] SSR 06-03p was rescinded effective March 27, 2017. *See* Rescission of Soc. Sec. Rulings 96-2p, 96-5p, and 06-03p, Fed. Reg. 82, 15,263 (Mar. 27, 2017). Because Plaintiff filed her DIB and SSI applications prior to March 27, 2017, SSR 06-03p applies to her claims. *See id.* ("This rescission will be effective for claims filed on or after March 27, 2017."); *Harrison v. Comm'r of Soc. Sec.*, 2018 WL 3153399, at *3 n.4 (W.D.N.Y. June 28, 2018) ("SSR 06-03p has been rescinded by Federal Register Notice Vol. 82, No. 57, page 15263, but remains in effect for claims filed before March 27, 2017.").

source[][.]" SSR 06-03p, 2006 WL 2329939, at *2 (stating "only 'acceptable medical sources' can be considered treating sources" and classifying "nurse practitioners" as "not 'acceptable medical sources'"); *see also Cherry v. Comm'r of Soc. Sec. Admin.*, 2020 WL 2550982, at *2 (2d Cir. May 20, 2020) (holding ALJ "properly discounted" nurse practitioner's medical opinion because she was "not an acceptable medical source when [the plaintiff] filed his claim") (summary order); *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam) ("[T]he diagnosis of a nurse practitioner should not be given the extra weight accorded a treating physician.").

Conversely, a "[l]icensed or certified psychologist[]" is an "acceptable medical source[]" under the applicable regulations when Plaintiff applied for DIB and SSI. SSR 06-03p, 2006 WL 2329939, at *1 (internal quotation marks omitted). Because Ms. Handy is a "Licensed Psychologist-Master[,]" *e.g.*, AR 110, her opinions qualify as treating physician opinions under the applicable SSA regulations.

Pursuant to the treating physician rule, an ALJ considering the opinion of a claimant's treating source first must decide "whether the opinion is entitled to controlling weight." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Even if the ALJ does not give a treating source opinion controlling weight, he or she must decide how much weight to give it by "explicitly" considering the following non-exclusive factors articulated in *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008): "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (alteration in original) (internal quotation marks omitted). "At both steps, the ALJ must give good reasons . . . for the weight [it gives the] treating source's [medical] opinion." *Id.* at 96 (second and third alterations in original) (internal quotation marks omitted). However, "slavish recitation of each and every factor" is not required so long as

10

"the ALJ's reasoning and adherence to the regulation are clear[.]" *Rivera v. Comm'r of Soc. Sec.*, 394 F. Supp. 3d 486, 494 (S.D.N.Y. 2019) (internal brackets omitted) (quoting *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013)).

"An ALJ's failure to explicitly apply the *Burgess* factors when assigning weight" to a treating physician's opinion "is a procedural error" that is harmless only if "a searching review of the record assures [the court] that the substance of the treating physician rule was not traversed[.]" *Estrella*, 925 F.3d at 96 (citations and internal quotation marks omitted). "Failure to provide such '"good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand.'" *Burgess*, 537 F.3d at 129-30 (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).

On November 30, 2015, Ms. Handy completed a Mental RFC Statement (the "2015 RFC Statement") in which she opined that since July of 2013, Plaintiff was unable to work forty hours per week. She found Plaintiff would be off-task for five percent of an eight-hour workday or less due to limitations in her ability to interact with the general public, maintain socially appropriate behavior, accept instructions from supervisors, and understand and remember very short and simple instructions. She also found Plaintiff would be off-task for fifteen percent of an average eight-hour workday due to limitations in her ability to understand and remember detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and set realistic goals or make plans independently of others.

Ms. Handy opined that Plaintiff is affected and distracted by disturbances in her life and family system, that "[c]rises are frequent[,]" and that Plaintiff "is emotionally disrupted." (AR 1422.) Ms. Handy further "assume[d]" but was "unsure" if Plaintiff's emotional condition exacerbated her symptoms of physical pain. *Id.* (emphasis omitted). In her 2015 RFC Statement, she found Plaintiff would be off-task more than thirty percent in an eight-hour workday, five days per week; would likely be absent and unable to complete an eight-hour workday for five days or more per month; and could be

expected to perform her job with less than fifty-percent efficiency as compared to an average worker. Ms. Handy also noted that, at the time of the assessment, Plaintiff was homeless, which "severely affected" her stability and mood, making her "depressed [or] anxious." *Id.* at 1423. She concluded Plaintiff was "unable to work consistently for at least the next year due to [her] health [and] emotional response to homelessness [which is] still not resolved[.]" *Id.*

On May 12, 2017, Ms. Handy completed a second Mental RFC Statement (the "2017 RFC Statement") noting a "[c]ontinuance of longtime recurren[t] symptoms, with periods of improved functioning/mood, hopefully increasing in length." *Id.* at 1880. On the DSM V Multiaxial evaluation, Ms. Handy diagnosed Plaintiff on Axis I with PTSD, unspecified depressive disorder, and panic disorder. She again opined that Plaintiff was unable to work forty hours per week since July of 2013 and found Plaintiff's limitations[6] impaired Plaintiff's performance for fifteen percent of an eight-hour workday. She stated that Plaintiff's memory lapses would also affect her ability to work a full day and advised that Plaintiff "experiences more pronounced physical symptoms, pain, heartrate, [and] breathing problems when highly anxious or depressed[.]" *Id.* at 1881. Ms. Handy's observations regarding the extent to which Plaintiff would be off-task, the number of absences in an eight-hour workday, and her efficiency relative to an average worker remained unchanged from 2015. Ms. Handy concluded Plaintiff's "functioning has dropped significantly since heart attacks and homelessness over recent [three] years, may be temporary if depression resolves in next few years (depression is recurrent, resolves periodically)[,]" that Plaintiff would be unable to obtain and retain work in a competitive work setting, and that her "[p]rognosis is not good for full[-]time work." (AR 1883.) Ms.

---

[6] Ms. Handy identified these limitations as impairing Plaintiff's ability to remember locations and work-like procedures; understand and remember very short and simple instructions; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule; complete a normal workday and workweek without interruption; perform at a consistent pace without an unreasonable number and duration of rest periods; and respond appropriately to changes in the work setting.

Handy stated that Plaintiff wants to work and may be able to "eventually" do so "a few hours a week or day" but that will "take time as recovery often plateaus or eases[.]" *Id.*

At Step Four, ALJ Groeneveld-Meijer gave "limited weight" to Ms. Handy's opinions because they were "rather conclusory, with little more than check-off forms used and minimal explanation for supporting her opinion that [Plaintiff] is unable to sustain work." *Id.* at 27. She found Ms. Handy's 2017 RFC Statement to be internally inconsistent regarding Plaintiff's ability to carry out instructions and inconsistent with Ms. Handy's treatment notes and Plaintiff's self-reported abilities. The ALJ cited a counseling note authored by Ms. Handy indicating that in spring of 2017, Plaintiff's mood was stable, she was active and doing well, she was planning to form a walking group, and she was getting along well with others.

The ALJ also determined Ms. Handy's opinions, in which she states the claimant's limitations date back to July of 2013, conflicted with a work questionnaire completed by Plaintiff's former employer, Jeremy Allaire from Quinland Farms, who indicated that until Plaintiff left her employment as a deli clerk in May of 2014, Plaintiff did not have limitations in her ability to function at work. The ALJ noted that Plaintiff reported she was able to complete household chores, be responsible for her daughter who has mental health issues, run errands, maintain appointments, and go shopping. She observed that Ms. Handy began treating Plaintiff on November 20, 2015,[7] and thus the ALJ questioned Ms. Handy's ability to opine regarding Plaintiff's limitations in July of 2013. Finally, the ALJ noted that Ms. Handy assumed Plaintiff's emotional condition exacerbated her pain, but that statement was based on Plaintiff's self-report and Ms. Handy's "medical expertise is not regarding physical limitations or assessing pain." *Id.* at 28.

Although the ALJ is correct that Plaintiff's ability to work is an issue reserved for the Commissioner, in evaluating Ms. Handy's opinions, the ALJ incorrectly summarized

---

[7] Ms. Handy stated in the 2017 RFC Statement that "[b]eginning of treatment" was November 20, 2015. (AR 1880.) In her 2015 RFC Statement, however, Ms. Handy identified November 20, 2015 as the treatment end date. *See id.* at 1420. The date range identified in the 2017 RFC Statement thus appears to indicate the time period covered by the 2017 RFC Statement, not the beginning of Ms. Handy's and Plaintiff's treatment relationship.

the date of commencement, duration, and frequency of the treatment relationship. *See Estrella*, 925 F.3d at 97 (noting the "first *Burgess* factor, and therefore evidence supporting its satisfaction, is of heightened importance in the context of [the plaintiff's] claimed impairment: depression"). Plaintiff's medical records contain over 100 pages of treatment notes from Ms. Handy, many of which pre-date November 20, 2015 and which reflect that Plaintiff saw Ms. Handy approximately once every week from January of 2014 through April of 2017.[8] It is procedural error to fail to consider the frequency, length, nature, and extent of a treatment relationship with a treating source. *See id.* at 96 (holding ALJ committed procedural error in failing to "explicitly consider" first *Burgess* factor where "[n]owhere in the ALJ's decision . . . is the fact that [the treating psychiatrist] treated [the plaintiff] from 2004 to 2006, and again from 2010 to 2013[,]" and the ALJ did not consider that treating psychiatrist provided "monthly psychotherapy sessions").

"Because the ALJ procedurally erred, the question becomes whether 'a searching review of the record . . . assure[s the court] . . . that the substance of the . . . rule was not traversed'—*i.e.*, whether the record otherwise provides 'good reasons'" for assigning limited weight to Ms. Handy's opinions. *Id.* (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). Although a close question, the court finds that it does not. Both the 2015 and 2017 RFC Statements contain more narrative information than described by the ALJ because in addition to checking off boxes, Ms. Handy provided explanations as to why she believed Plaintiff would be unable to work consistently through an eight-hour workday and whether she expected Plaintiff's symptoms would resolve.[9] "[T]he fact that

---

[8] *See, e.g.*, AR 1138 (performing on January 2, 2014 an intake interview in which Ms. Handy stated Plaintiff "worked periodically with this clinician at WCMHS"); *id.* at 1145 (providing individual plan of care for 2014 for Plaintiff's "[g]eneralized anxiety, depression, rapid thoughts, sleep disturbance, grieving recent losses, experiencing financial problems that may affect housing[,]" which indicates Plaintiff saw Ms. Handy once per week for "Individual Therapy").

[9] *See, e.g.*, AR 1422 ("[C]lient is highly affected [and] distracted by disturbances in her life [and] family system. Crises are frequent and client is emotionally disrupted."); *id.* at 1883 (stating "[Plaintiff] may have temporary problems with cognition and expression when very depressed" and "Client's functioning has dropped significantly since heart attacks and homelessness over

14

much of [an] opinion consists of 'check-marked findings' is not a sufficient reason to discount it where the clinical and diagnostic bases for the opinion are included." *Gerbasi v. Comm'r of Soc. Sec.*, 2015 WL 4470001, at *8 (D. Vt. July 21, 2015); *see also Brady v. Comm'r of Soc. Sec.*, 2020 WL 613935, at *5 (W.D.N.Y. Feb. 10, 2020) (holding check-box was not a good reason for rejecting treating physician opinion because it "provided more narrative and detail on the form than just check-boxes"). To the extent the ALJ found Ms. Handy's narrative explanations to be insufficient, it was her duty to contact Ms. Handy to obtain additional clarification before determining her opinions were not entitled to controlling weight. *See Garcia Medina v. Comm'r of Soc. Sec.*, 2019 WL 1230081, at *4 (W.D.N.Y. Mar. 15, 2019) ("If the ALJ felt the [treating source's] form lacked sufficient narrative, he could have contacted [the treating source] and requested additional information."); *Prince v. Berryhill*, 304 F. Supp. 3d 281, 288 (D. Conn. 2018) ("Given the critical role a treating physician opinion plays in the ALJ's determination, upon receiving a clearly inadequate opinion [containing check boxes without any elaboration], the ALJ was obligated to contact [the physician] or ask [plaintiff's] representative to re-contact [the physician] for an opinion in which [the physician] offered his expertise and knowledge of his patient.").

The ALJ also cited an internal inconsistency in Ms. Handy's 2017 RFC Statement "regarding carrying out instructions" as a reason for affording that opinion limited weight. (AR 27.) The ALJ summarized Ms. Handy's 2017 RFC Statement as opining that Plaintiff "is presently precluded from performing [fifteen percent] or more of an [eight]-hour workday, in many areas, including maintain[ing] attention and concentration, understanding and remembering very short and simple instructions, but also indicates no limitations for carrying out detailed instructions." *Id.* This is an inaccurate description of Ms. Handy's 2017 RFC Statement, which states that Plaintiff would be precluded from performing fifteen percent or more of an eight-hour workday due to functional limitations in her ability to carry out detailed instructions. *See id.* at 1882. It is possible the ALJ

---

recent [three] years, may be temporary if depression resolves in next few years (depression is recurrent, resolves periodically)").

intended to reference the internal inconsistency in Ms. Handy's 2015 RFC Statement, wherein Ms. Handy opined Plaintiff had limitations in carrying out very short and simple instructions but no limitations in carrying out detailed instructions. *See id.* at 1421.

Although the ALJ properly pointed out that at least one of Ms. Handy's counseling notes from 2017 was inconsistent with her opinions, *see id.* at 27 (citing to counseling note from March 17, 2017 indicating Plaintiff was "stable[,]" "coping well[,]" and "active in using community supports") (citing AR 1848), as the Second Circuit has explained: "Cycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Estrella*, 925 F.3d at 97 (alteration in original) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014)). Ms. Handy has also described Plaintiff as "[a]nxious[,]" AR 1219, "hopeless[][,]" *id.* at 1599, experiencing "sadness, anger and grief" in connection with childhood trauma, *id.* at 1773, "possibly ill or dissociative," *id.* at 1843, and "depressed[.]" *Id.* at 1484, 1845. These descriptions are consistent with the treatment notes of other providers who have examined Plaintiff.[10]

Plaintiff testified that she is unable to work because her psychological symptoms have worsened with persistent flashbacks, she has difficulty with sleep, and she observed

---

[10] *See, e.g.*, AR 1229, 1231 (examination by Dr. Korgeski on August 25, 2015, noting Plaintiff's mood during mental exam "was moderately depressed or dysphoric with mild to moderate anxiety[,]" that Plaintiff was "tearful a few times[,]" and giving "diagnostic impressions" of anxiety disorder, PTSD, panic disorder, depressive disorder, ADHD "by self-report and medical history[,]" dependent personality features, and possible neurocognitive disorder subsequent to a heart attack); *id.* at 1424-25 (assessment by "Community Health Team" on November 18, 2015 noting Plaintiff has "[m]oderately [s]evere [d]epression" and is "overwhelmed [with] current life stressors and struggles to consistently practice healthy coping skills and medication compliance. [Plaintiff] has [unprocessed] trauma, ongoing depression and anxiety."); *id.* at 1716 (treatment notes of Paul Sahba, M.Ed., LCMHC, dated October 11, 2016, describing Plaintiff as reporting "fear and confusion" and "breaking down into tears a lot").

someone commit suicide,[11] although she reported to Dr. Korgeski that her "symptoms have been abating slowly" and that she was "having fewer panic attacks than she did and some slow improvement in her mood but she is continuing to be troubled by hypervigilance, panic symptoms at times, [and] depression." (AR 1227.)

Plaintiff's Individual Plan of Care with Ms. Handy for 2017 indicates Plaintiff had "PTSD symptoms, panic, and depressive symptoms" that were "moderate to major" at the time the plan was authored. *Id.* at 1856. At the counseling session immediately prior to the one cited by the ALJ, Plaintiff "presented in tears and in pain," and Ms. Handy discussed with Plaintiff how "intense stressors (such as homelessness she recently experienced) will exacerbate other symptoms, such as anxiety, depression, dissociation (she described some recent instances), anger, and self[-]esteem issues." *Id.* at 1845. "The ALJ made no attempt to 'reconcile' or 'grapple with' the apparent longitudinal inconsistencies in [Plaintiff's] mental health—one of the motivations behind *Burgess*'s procedural requirement of explicit consideration of 'the frequen[cy], length, nature, and extent of [a physician's] treatment.'" *Estrella*, 925 F.3d at 97 (second and third alterations in original) (quoting *Selian*, 708 F.3d at 418-19). When viewed in conjunction with other treatment notes from the same time period indicating Plaintiff's symptoms were persistent and cyclical, "the ALJ's [one] cherry-picked treatment note[]" does not provide a "'good reason[]' for minimalizing" Ms. Handy's opinions. *Id.*

The Commissioner cites Plaintiff's former employer's report that Plaintiff did not have difficulty functioning and that Plaintiff worked for this employer until May 29, 2014, after the July of 2013 symptom onset date identified by Ms. Handy. "Depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from . . . a nonmedical source may outweigh the medical opinion of an acceptable medical source, including the medical opinion of a treating source." 20 C.F.R. §§ 404.1527(f)(1), 416.927(f)(1). Mr. Allaire indicated in a "Job Screening

---

[11] The ALJ erroneously referred to this as Plaintiff's suicide attempt. *See* AR 22 ("She testified that she is unable to work now because since her heart attack, her psychological symptoms have worsened, with persistent flashbacks, difficulty with sleep, and she attempted suicide.").

Questionnaire" submitted on September 9, 2015 that Plaintiff could perform all functions associated with her job as a deli clerk at Quinland Farms without problems, including learning job duties in the expected amount of time, cooperating with coworkers as required, adapting to work changes, and understanding and carrying out simple directions in a reasonable amount of time. He also stated Plaintiff quit her position as deli clerk and that he had "no idea" why. (AR 556.) As the ALJ acknowledged, Mr. Allaire "is not an acceptable medical source[] and does not have medical expertise to make assessments of [Plaintiff's] impairments or the nature and extent of her symptoms." *Id.* at 28. Under the regulations, his opinion cannot override a treating source opinion without good reasons. *Cf.* 20 C.F.R. §§ 404.1527(f)(1), 416.927(f)(1) (noting "it may be appropriate to give more weight to" an other source if that source "has seen the individual more often than the treating source"). Although she cited Mr. Allaire's opinion, the ALJ did not provide reasons for crediting it over a specialist's opinions based upon a lengthy treatment relationship.

The Commissioner further argues that Plaintiff engaged in extensive activities of daily living that are inconsistent with Ms. Handy's opinions. Although these observations are not without merit, "a claimant need not be an invalid to be found disabled under the Social Security Act." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988)). Accordingly, "[w]hen a disabled person gamely chooses to endure pain in order to pursue important goals," such as taking responsibility for one's child or helping to shop for her family, "it would be a shame to hold this endurance against [her] in determining benefits unless [her] conduct truly showed that [she] is capable of working." *Id.* at 81-82 (internal quotation marks omitted). The ability to perform household chores, run errands, and maintain appointments does not demonstrate Plaintiff was capable of performing work on a full-time basis.

Finally, the Commissioner is correct that Ms. Handy's area of medical expertise does not relate to assessing physical limitations and pain, and thus the ALJ did not err in discounting Ms. Handy's opinions regarding the exacerbation of Plaintiff's physical

symptoms due to her emotional condition. *See* 20 C.F.R. §§ 404.1527(c)(5),
416.927(c)(5) (stating the ALJ will "generally give more weight to the medical opinion of
a specialist about medical issues related to his or her area of specialty than to the medical
opinion of a source who is not a specialist"). This conclusion, however, does not address
the ALJ's finding that Plaintiff "has some significant functional limitations due to
psychological impairments" (AR 24) and her failure to consider whether those
impairments will result in Plaintiff being off-task or absent from work.

The ALJ drafted an RFC "limiting [Plaintiff] to routine work and no regular
interaction with the public[,]" *id.*, but rejected corroborating evidence from APRN
Greenleaf that Plaintiff would be off-task for a significant part of every workday.[12] Drs.
Patalano and Hurley both opined that Plaintiff had moderate limitations in concentration,
persistence, and pace and that Plaintiff could perform in these areas in two-hour
increments over an eight-hour workday. *See id.* at 378, 408. The ALJ's RFC does not
reflect how these two-hour increments would be accommodated. *See Crump v. Saul*, 932
F.3d 567, 570 (7th Cir. 2019) (noting to observe "that a person can perform simple and
repetitive tasks says nothing about whether the individual can do so on a sustained basis,
including, for example, over the course of a standard eight-hour work shift" and
remanding where the RFC was "altogether uninformed by considerations of off-task time
or unplanned leave"); *Krysten D. v. Saul*, 2020 WL 70072, at *6 (N.D.N.Y. Jan. 7, 2020)
(remanding where the RFC contained "no assessment of whether Plaintiff would be off-
task or miss work due to her mental health symptoms" even though medical opinions to
which the ALJ accorded great weight identified limitations in that area).

On balance, the ALJ did not provide "good reasons" for failing to accord Ms.
Handy's opinions controlling weight and therefore "traversed the substance of the
treating physician rule." *Estrella*, 925 F.3d at 98. This error was not harmless because VE

---

[12] In a Mental RFC Statement dated December 10, 2015, APRN Greenleaf opined Plaintiff
would be off-task twenty-five percent of an eight-hour workday, five days a week, and absent for
five days or more per month. *See* AR 1430. On May 5, 2017, APRN Greenleaf advised "[t]here
have not been any significant changes" to Plaintiff's mental health since he completed the 2015
RFC Statement. *Id.* at 1877.

Bopp testified that Plaintiff would be precluded from performing any of the jobs identified at Step Five if she were off-task more than twenty-five percent of the day and would be absent or unable to complete an eight-hour workday five or more days per month. As a result, a remand is warranted. *Id.* (remanding "[i]n light of the ALJ's failure to 'explicitly consider' the first *Burgess* factor before assigning 'little weight' to the opinion of [plaintiff's] treating psychiatrist, and the lack of other 'good reasons' to support that decision"). "On remand, the ALJ should apply all four *Burgess* factors in determining the appropriate weight to accord to [Ms. Handy's] opinion[s]." *Id.* If the ALJ requires additional information from Ms. Handy, she must obtain it.

The weight afforded to Ms. Handy's opinions on remand may impact the weight afforded to the opinions of APRN Greenleaf as well as the opinions of the state agency consultants. *See Johnson*, 817 F.2d at 986 ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."). For this reason, the court does not address Plaintiff's remaining arguments that the ALJ improperly accorded only partial weight to Dr. Korgeski's opinion and erred in according significant weight to the opinions of Drs. Knisely, Patalano, and Hurley.

## CONCLUSION

For the reasons stated above, the court GRANTS Plaintiff's motion for an order reversing the decision of the Commissioner (Doc. 7) and DENIES the Commissioner's motion to affirm. (Doc. 10.) On remand, the ALJ must apply the *Burgess* factors to determine whether to afford Ms. Handy's opinions controlling weight. If additional

information is necessary to evaluate Ms. Handy's opinions, the ALJ must obtain it.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 19th day of August, 2020.

Christina Reiss, District Judge
United States District Court